Clark and Wife vs. Henry's Adm'r·

CLARK & WIFE vs. HENRY'S ADM'R.

1. Courts of equity in this State, are not confined in their jurisdiction to cases in which adequate relief cannot be had at law. The 5th clause of 8th sect. of the act establishing courts, R. C. 1835, was not intended to restrict courts of equity, nor to take away any power usually exercised by them.

2. Courts of equity have jurisdiction of a bill charging an executor with waste in ·not accounting for property which had come into his hands, although a final settlement had been made with the county court.

3. In such a proceeding, neither the heirs of the testator, nor the administrator *de bonis non,* of his estate, are parties interested.

4. Although slaves are personalty, yet they are regarded as of a peculiar, and distinctive character, and would not be embraced in a general bequest of personal property, unless the intention of the testator were plain, and manifest—hence it was held, that a clause in a will in these words, "My crop of grain, farming utensils, and household and kitchen furniture, and stock, all of which I want valued and acted on according to law, after my affairs are settled, then if there is a residue from hire of negroes, crop, &c., I wish to be given to Eleanor Erwin," could not be construed to embrace a slave born after the death of the testator.

## APPEAL from Lincoln.

CARTY WELLS, for Appellants.

BATES, for Appellee.

### POINTS.

1. A court of equity has no jurisdiction, the subject matter being proper for a court of law.

2. The proper parties are not made, and on this bill the court cannot do complete justice.

3. The merits are with the defendant.

NAPTON, J., delivered the opinion of the court.

In 1836, Eleanor Erwin filed her bill in the circuit court of Lincoln county, against Francis Henry, executor of the last will and testament of Malcolm Henry, deceased. The bill was dismissed by the circuit court for want of equity. An ppeal was taken to this court, and the decision of the circuit court for Lincoln county was reversed, and the cause remanded. (See 5 vol. Mo. R. 471.) The substance of the original bill, as well as the grounds of the decision of this court, may be

found in the report of this case. The complainant subsequently inter-married with one William Clark, who is now a co-complainant; they filed their amended bill at the November term, 1838. This amended bill represents that Malcolm Henry died in September, 1832, having made his will, in which, among other things, is found the following: "Item 1st, It is my desire and will, that my boy Adam, Juno and Cynthia, be released from bondage, on condition that Juno serve my sister Mary one year; Adam and Cynthia to serve the executor of my estate, (or serve them whom he may hire them to,) Adam to serve two years, and Cynthia to serve four, each then to have their perfect freedom." The will concludes as follows : "My crop of grain, farming utensils, and household and kitchen furniture and stock, all of which I want valued and acted on according to law, after my affairs are settled, then if there is a residue from hire of negroes, crop, &c., I wish to be given to Eleanor Erwin."

The bill charges that the executor, shortly after the death of the testator, about the 25th September, 1832, took out letters testamentary, took possession of the real and personal estate, made inventories, paid debts, and collected money due the estate; that he paid all the debts and all the specific legacies, and sold all the personal property which the will had directed to be " acted on according to law ;" that in November, 1835, the said defendant made a final settlement of his executorship, and that upon said final settlement, the county court of Lincoln county, did find, that after paying the specific legacies and funeral expenses, and the debts owing by said estate, and the expenses of settling the same, there was no residue. The bill then charges, that the assets were more than sufficient to pay all debts and expenses and legacies and that the executor had fraudulently appropriated a large amount to his own use. The complainants further allege, that the female slave, Cynthia, after the testator's death, and before she became free by the will, had a female child, (named Adaline,) and in relation thereto the testator died intestate, and charges that the executor failed to apply the value of the slave Adaline, the wearing apparel of the estate, the hire of Adam for two years, and of Cynthia for four years, to the purposes of the estate, but had appropriated the same to his own use. The bill charges that various articles, among others, a horse, some hides, and corn, were not inventoried as they should have been. The bill further charges that the executor opened a trunk of said testator, and calls for a discovery of its contents.

The answer admits the statements of the bill, in relation to the will, executorship, and taking possession of the assets—affirms, that inven-

22

tories were made of all the property of the deceased—declares that the defendant has paid all the legacies, and among others, complainant's ; that he made regular settlements with the county court as required by law, and made his final settlement at the time specified in the bill ; and that upon such final settlement, it was adjudged that there was a balance due the defendant from the estate, of $77 31 3-4. The answer further declares, that the defendant paid to complainant $117, and took her written receipt for the same, which sum is the precise amount of the hire of the negroes, mentioned in the bill, after deducting the balance found in his favor as above stated, on final settlement. The answer admits all the allegations in relation to the woman Cynthia, and her child, and admits his present possession of said female child. The respondent further avers that he duly accounted with the county court, for all the cash and other property which was found on the premises of the testator, or which in any manner came to his hands ; denies all fraud or concealment of property, and contends that the inventories and settlements with the county court cannot again be investigated.

The evidence read at the hearing, established that the negro man, Adam, would have hired for about ninety dollars during the years 1833 and '34—that the woman Cynthia, would have hired for about $25, with the incumbrance of a child, without such incumbrance she was worth more. There was no evidence to establish any payment on the part of the defendant, as averred in the answer, except a tender of $125 in cash and notes, which was refused by the complainant. The charges in relation to the trunk, the hides, and wearing apparel, appear to have been waived.

Upon the hearing of the cause, the circuit court dismissed the bill, and the cause is brought here by appeal.

The first question which demands consideration, is the one relating to the jurisdiction of the court. This question was considered and determined by the court when the case was before it on a former occasion, (see Erwin vs. Henry, 5 M. R.) So far as the conclusion to which the court then arrived was founded upon the phraseology of the 15th section of the act concerning courts, it is not, as we have heretofore taken occasion to observe, (Miller vs. Woodward & Thornton, 8 Mo. R. 169,) authorized by the language of that section. The jurisdiction of courts of equity in cases like the present, must rest upon the broad clause of our statute, which gives them the general control over executors and administrators, and upon that well settled maxim by which courts of equity retain a jurisdiction originally acquired by rea-

son of the want of a complete and adequate relief at law, notwithstanding the common law courts have been subsequently invested by the legislature with full power over the subject. The jurisdiction of courts of equity rests upon the same foundations as that of courts of common law, however the jurisdiction of either may have been originally acquired. It is not to statutory provisions that we look for ascertaining the limits of either. Long usage, the decisions of the courts, and the treatises of learned writers, are the chief sources to which we have recourse, when legislative enactments are silent, for the purpose of learning the province of either courts of law or courts of equity. Why should a different rule be adopted in the one case than the other? It is because the legislature have declared that courts of equity shall have jurisdiction in all cases where adequate relief cannot be had by the ordinary course of proceedings at law? This we understand to be a mere general definition of the nature and character of chancery courts, as contradistinguished from courts of common law. If interpreted strictly and literally, as has been urged at the bar in the present case, to what narrow limits would our courts of equity be confined? Entire branches of equity jurisprudence, heretofore and up to the present time, exercised without dispute or question, would be lopped off from the system. The whole subject of fraud, a most prolific source of equity jurisdiction, may now be fully investigated in the common law courts. The foreclosure of mortgages has been provided for, and courts of common law are as competent to sell equities of redemption, as courts of equity formerly were. Discovery can now be had at law, as well as in equity, and accidents arising from lost instruments, may be remedied as well on the common law, as on the chancery side of our dockets. Yet courts of equity in this State, have continued to exercise their accustomed jurisdiction on these, and other subjects similarly situated, notwithstanding the general provision in our code restricting them to cases where adequate relief cannot be had at law. To say the least, it would be highly impolitic, at this late day, to attempt to cut off the sources of jurisdiction, without a more express and definite declaration from the legislative department of the government. It would be a bold step on the part of this court to undertake now to correct this *communis error*, if it be one, into which our lawyers and courts have indiscriminately fallen. But we apprehend that the legislature did not design so to restrict the power of courts of equity. The language employed in the 5th clause of the 8th section of the ac- establishing courts, was probably as accurate as could have been suggested, to define the general purposes and objects of a court of equity.

It was such a definition as might have been found in any elementary treatise on equity law, the writers on which science having frequently described equity to be that branch of the law, designed to remedy that wherein the common law, by its universality, is deficient.

The seventh article of our administration act, has given to the county courts jurisdiction in actions of waste against an administrator or executor; yet this has not been supposed to divest the circuit courts of the power to try actions of waste. Why should it deprive the court of chancery of a proceeding, which has been more commonly resorted to than an action of waste, or a suit upon the bond of an executor or administrator?

In the case now under consideration, the estate has been settled, and the bill does not seek to revise any action which the county court has had in relation to that settlement. It charges that the executor did not account for all the property which came to his hands; that nothing has been done with the slave Adaline, and that the hire of the negroes is unaccounted for. Upon these charges, and charges of a similar nature, the executor is sought to be held personally responsible. That bills of this character have been generally entertained by courts of equity is not denied; and we have not been able to perceive any provision in our statute which would prevent them from being enterentertained here.

This view of the nature of the present proceeding, will also dispose of the second objection, which relates to the want of proper parties. Since the case has been depending here, the death of Francis Henry, has been suggested, and the suit revived against his administrator.

It is contended that the administrator *de bonis non*, as well as the heirs of Malcolm Henry, deceased, should have been made parties. But as this is not a proceeding against the estate of Malcolm Henry, but against his executor for a *devastavit*, there can be no necessity for joining the heirs of Malcolm Henry, or the administrator of the goods unadministered by his executor in this suit.

The remaining question presented by the record, involves the propriety of the decree of the circuit court, upon the bill, answer and testimony.

The first branch of this enquiry relates to the condition, and proper disposition of the child of Cynthia, named Adaline, born after the death of the testator. It is contended that Adaline is a slave, and that her value should be substituted in lieu of the other personal property which was sold to pay the testator's debts, and that complainant is entitled to her value, under the clause which makes her the residuary legatee of

certain personal property. This claim depends upon the construction of the testator's will. The clause relating to the subject is as follows : "My crop of grain, farming utensils, and household and kitchen furni⸗ ture, and stock, all of which I want valued and acted on according to law, after my affairs are settled, then if there is a residue from the hire of negroes, crop, &c., I wish to be given to Eleanor Erwin." By this clause the testator designs his stock, crop, farming utensils, and other personal property of the like kind to be sold, and applied to the payment of his debts, and if a surplus remains, it is bequeathed to the complainant. She is then a special contingent residuary legatee, and the question arises whether the slave Adaline (we assume she is a slave for the purposes of investigation) was in the costemplation of the testator, or whether it can be inferred from the language of this clause, that she was designed to be embraced within the general enumeration of property, from the sale of which the complainant's legacy was to be derived.

Slaves are by our law personal property, bi t of a distinctive, and peculiar character. In all, or nearly all of the slaveholding States, they are declared personal property, and are transferred as other personal property. In all of them, they may with propriety, be called personal property, as contradistinguished from land. Yet the laws of all these States, and the decisions of their courts, have recognized a value in this species of property, arising from circumstances independent of their mere pecuniary value in the market. The age, health and disposition of slaves, their aptitude for particular employments, the length of time during which their owners, or their owner's ancestors have possessed them, their matrimonial connexions, and other like circumstances, contribute to fix the degree of estimation in which their proprietors hold them, apart from the amount of money into which they can be converted in market. This fact as may be readily conjectured, has not been lost sight of in the legislation of the slaveholding States. Hence it was held by this court in the case of Rennick vs. Chloe (7 Mo. R. 197) that an act of the Kentucky Legislature, authorizing individuals to dispose of their chattels by will, did not authorize them to liberate their slaves, the court presuming that when the Legislature designed to embrace slaves in the provisions of a law, they would do so, *eo nomine*, and not under the general designation of *chattels*. Hence also, under our administration laws, slaves are the last species of personal property, subject to be sold for the payment of debts, and indeed the county court is authorized to order the sale of *lands* in preference to slaves, where such a course seems beneficial

to the estate, or when it is desired by the legatees or distributees. Whilst therefore slaves are personal property, and may be transferred under this general designation, it is worthy of observation, that neither our legislatures in enacting laws affecting this property, nor individual owners, in declaring their intended disposition of it, either by deed or will, have been apt to lose sight of the fact that they are also human beings, and therefore the intention to affect this species of property, under the general description of *personalty*, should appear manifest and plain, before a court could give such language, so broad an interpretation.

The question then recurs upon the interpretation of this will;—was it the design of the testator, when he desired his crop of grain, farming utensils, household and kitchen furniture, &c., to be sold, and in the event of a surplus, after the payment of his debts, that such surplus should be given to the complainant, to include the slave, Adaline, in this enumeration?   It is conceded that by a fair interpretation of the will, the enumerated articles were only designed as specimens of the kind of property from which the residuary legacy to E. Erwin, was to arise. The clause may be extended to every species of personal property of a similar character and value, with those enumerated ; but to extend it still further and include a species of property of greatly superior value and consideration, and of a distinctive character such as slaves, would be a perversion of the manifest intent of the testator.   Is it to be supposed, that the testator, who evinced a remarkable anxiety to liberate all his slaves, upon certain conditions specified in the will, should have been willing to dispose of one unborn, under an "&c." attached to an enumeration of grain, farming utensils, furniture, and similar articles of small value?   Had the testator been the owner of fifty, instead of two female slaves, and liberated the fifty, upon the same terms he did Cynthia, and the fifty slaves became the mothers of as many children, the legatee of the surplus arising from the sale of grain, stock, &c., would have been thought to manifest a good deal of assurance to claim the fifty slaves.   Yet the principle is the same. Had the testator been left a landed estate, of which at the time of making his will he was ignorant, it would be admitted that such estate would not pass, because the residuum is limited to personal property. It is limited to personal property, and limited as we think, further, to such description of personal property, as would correspond in some degree, both in regard to its character, and its value, with the species of personal property enumerated.   Certainly it cannot reach

slaves, a species of property as distinctive in its character, as real estate.

When we consider that the complainant is not the first, or principal object of the testator's bounty; that she is only a contingent legatee at most, and that the fund, from which her legacy was to spring, embraced only articles of small value, that the testator had devised his farm to one, and a slave to another, and this slave only for the life of the legatee, evincing by his careful disposition of every slave he had, his intention of not confounding his slaves with the mass of his personal estate, it seems difficult, if not impossible, to arrive at the conclusion, that this slave was designed by the testator, either for the payment of his debts, or for the benefit of the complainant.

Upon this construction of the will, what right has the complainant to ask that the value of this slave, shall be substituted for the personal property, which was applied to the payment of debts? What claim can there be to substitution, where the fund was properly and rightfully appropriated? The personal property of the testator was sold, as his will directed, and the slave which came into existence after his death, about which the will was silent, was not sold because not needed for that purpose. There was then no mal-administration, so far as this slave was concerned, for the residuary legatee of another fund, not embracing the slave, had no claim or title to her.

As to the hire of the negroes, the defendant admits that the amount actually received from this source was $194 31. Deducting from this, the sum of $77 31, that being the balance due him on final settlement, leaves the sum of $117, which defendant tendered to complainant in money and notes, but which was not received. The witnesses state Adam to have been worth $90 per annum, and Cynthia $25—this would make the hire amount to $280; which after the deduction of $77 31, would leave a balance against the defendant of $202 69. For this sum we think the complainant entitled to a decree.

The decree of the circuit court is therefore reversed, and this court doth order, adjudge and decree, that the defendant pay to the complainant the sum of two hundred and two dollars and sixty-nine cents.